Betty J. LAWSON, Administratrix of
the Estate of John W.
Lawson, Appellant,

v.

PUBLIC SERVICE COMPANY OF
INDIANA, INC., Appellee.

No. 1–285A44.

Court of Appeals of Indiana,
First District.

June 10, 1986.

Rehearing Denied July 22, 1986.

Lance D. Cline, Kirk R. Kitzinger, Townsend, Yosha, Cline & Price, Indianapolis, for appellant.

C. Rex Henthorn, Harding, Henthorn & Harris, Crawfordsville, John B. Scheidler, Plainfield, for appellee.

NEAL, Judge.

### STATEMENT OF THE CASE

Plaintiff-appellant, Betty J. Lawson (Mrs. Lawson), Administratrix of the estate of her deceased husband, John W. Lawson (Lawson), appeals the decision of the Montgomery Circuit Court which granted summary judgment in favor of defendant-appellee, Public Service Company of Indiana (PSI), precluding liability on the part of PSI for the death of Lawson.

We affirm.

### STATEMENT OF THE FACTS

The following facts are not in dispute. On June 27, 1982, Lawson was helping his neighbor, Daniel Ramsey (Ramsey), construct a room addition to the Ramsey home. Before the walls to the addition could be erected, a 12′ x 20″ section of the house's roof overhang needed to be removed. While Lawson was attempting to

remove a portion of the overhang which provided support to the house's electrical service equipment, the service equipment broke loose, knocked Lawson off a ladder, and electrocuted Lawson as the electrical wires came to rest across his chest and neck.

PSI supplied electricity to the Ramsey residence which was transmitted through various forms of electrical service equipment. On the outside of the Ramsey home, a meter base was attached to the home, approximately five feet off the ground, into which a PSI meter was plugged. A cylindrical metal tube called a "service raceway" was screwed into the top of the meter base and ran up the side of the house and through the roof overhang to a point about two feet above the roof line. The service raceway included a "weatherhead," a curved steel pipe, which was screwed into the top of the raceway. Two polyurethane (insulation) coated "service entrance conductors" and a neutral wire ran from the meter through the service raceway and weatherhead to a point about one foot out of the top of the service raceway and weatherhead. Ramsey, as resident, was the owner of this electrical service equipment up to this point.

PSI was responsible for the electrical service equipment leading up to Ramsey's service entrance conductors. From a transformer on a PSI pole outside of Ramsey's backyard, two polyurethane coated "service conductors" and a neutral wire (each 105 feet long) ran a distance of approximately 95 feet to connect with the service entrance conductors leading from Ramsey's home. PSI's service conductors ran to the service raceway where they were attached to brackets a short distance below the top of the raceway to provide support for the weight of the service conductor. From the brackets on the service raceway, the service conductors extended a short distance to connect with Ramsey's service entrance conductors. PSI spliced its service conductors together with Ramsey's service entrance conductors using metallic split bolt connectors before the connections were covered with a cloth friction tape. After the splice was made, PSI plugged its meter into Ramsey's meter base to complete the circuit. Although Ramsey had owned his home for approximately 4½ years, the home, the electrical service equipment attached to it, and the taped splice were approximately 28 years old.

Support for the electrical service equipment attached to the Ramsey house was as follows. The meter base was attached to the wall of the Ramsey house by wood screws. The service raceway was screwed into the top of the meter base. It extended vertically up the side of the house through a hole in the roof overhang which was cut specifically for that purpose when the house was constructed. This roof overhang, which provided the main support for the service raceway, consisted of the shingles, the plywood roof decking, the roof rafters, the guttering, the plywood soffit, and the soffit support boards. In addition, tar was placed around the service raceway at the roof opening.

When Lawson arrived on June 27, everything on the roof overhang had been removed except for the plywood roof decking and the roof rafters. Without notifying PSI, Lawson and Ramsey decided to remove a section of the plywood roof decking from around the service raceway. With a circular power saw, they made two cuts from the edge of the overhang toward the house, north and south, one on each side of the service raceway. They apparently ran into difficulty in trying to make an east and west cross cut in order to remove the section of the plywood roof decking encasing the service raceway. Instead, after observing the top couple of layers of the decking around the service raceway had buckled and rotted, they decided they could snap off the remaining part of the decking between the two side cuts without sawing any further.

Lawson positioned a stepladder directly in front of the service raceway and between the service raceway and PSI service pole. He took a hammer, climbed up to the

fourth step, held on to the edge of the roof decking with one hand, and began to scrape off the top layers of the decking with the claw end of the hammer. Lawson scraped the decking for a short time until the whole section of the roof decking between the two side cuts which encased the service raceway broke loose from the house. The weight of the service conductors caused the service raceway to fall toward the PSI service pole. As a result, the service raceway knocked Lawson off of the stepladder as it fell. The service raceway came to rest diagonally across Lawson's chest and neck.

Lawson never moved once he struck the ground. Ramsey lifted the raceway off of Lawson with a broom handle and noticed the right side of Lawson's neck and cheek were swollen. Attempts by Ramsey and a rescue squad to resuscitate Lawson were unsuccessful. Later, the Marion County Coroner conclusively established that the cause of Lawson's death was electrocution, which was evidenced by electrical burns on the right side of Lawson's neck.

The trial court, in its Order on Motion for Summary Judgment, found the following:
"The court further finds as a matter of law that defendant was not negligent in any respect which proximately caused the injury to and death of plaintiff's decedent. Even if defendant might be considered negligent by allowing a dangerous condition to exist, failing to inspect or maintain or failing to warn such negligence was not the proximate cause of plaintiff's decedent's injury and death. The court finds that as a matter of law plaintiff's decedent was negligent in failing to exercise reasonable care to provide for his own safety and that plaintiff's decedent's own negligence was what proximately caused his injury and death."

### ISSUES

I. Was the trial court correct in finding as a matter of law that any breach of a duty owed by PSI to Lawson was not the proximate cause of Lawson's death?

II. Was the trial court correct in finding as a matter of law that Lawson was negligent himself in failing to exercise reasonable care to provide for his own safety?

### DISCUSSION AND DECISION

A motion for summary judgment will be proper where there are no genuine issues of material fact and the law was correctly applied. *Law v. Yukon Delta, Inc.* (1984), Ind.App., 458 N.E.2d 677, *trans. denied.* It is the moving party's burden to establish the absence of genuine issues as to material facts, and all reasonable inferences to be drawn from the facts presented must be construed in favor of the party opposing the motion. *Ashlock v. Norris* (1985), Ind. App., 475 N.E.2d 1167, *trans. denied.* Summary judgment is normally an inappropriate vehicle in disposing of issues involving negligence and contributory negligence where the facts of the case are subject to more than one reasonable inference or conclusion. *Hundt v. LaCrosse Grain Co.* (1983), Ind., 446 N.E.2d 327; *Law, supra; Manning v. Allgood* (1980), Ind.App., 412 N.E.2d 811. However, when the facts of the case are undisputed, and only one inference can reasonably be drawn, judgment can be entered as a matter of law. *Hundt, supra.* Even when review is based on the grant of a motion for summary judgment, the trial court's judgment will be affirmed if it can be sustained on any theory or basis found in the record. *Id.* Therefore, if the trial court's ruling can be supported as a matter of law, we will not disturb its judgment.

Mrs. Lawson's negligence claim against PSI is premised on the following. PSI had a duty to (1) properly insulate the splice; (2) determine suitable anchoring for the raceway; (3) inspect and maintain the insulation and anchoring; and (4) warn of potential hazards. Mrs. Lawson derives these duties through various statutes, administrative rules and regulations, industry codes, and internal PSI policy. Even assuming that PSI breached its duties to Lawson as Mrs. Lawson suggests, this case

can be properly resolved on the issues of proximate cause and negligence on the part of Lawson.

While the trial court found that PSI had not breached any duty to Lawson, the court also precluded recovery by finding that any act or omission on the part of PSI was not the proximate cause of Lawson's death. Proximate cause was defined in *Bridges v. Kentucky Stone Co.* (1981), Ind., 425 N.E.2d 125, 127: "[A] negligent act or omission is the proximate cause of an injury if the injury is a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated." Where an actor's negligence sets in motion the chain of events or circumstances leading to an injury, the test in holding whether an act or omission is the proximate cause of the injury is forseeability. *Havert v. Caldwell* (1983), Ind., 452 N.E.2d 154. This forseeability test is also related to the rule that an intervening cause may cut off liability of the original party whose original act or omission set in motion the chain of events or circumstances leading to an injury. *Id.* Nevertheless, the intervening cause must be one which could not have been reasonably foreseen before it will serve to cut off the liability of the original wrongdoer. *Id.*

■ The relation between an intervening cause and proximate cause was stated in *Havert, supra,* at 158, quoting 21 I.L.E. *Negligence* Sec. 67, at 330–31 (1959):

"An intervening cause, with respect to the doctrine of proximate cause, means, not a concurrent and contributing cause, but a superseding cause, which is itself the natural and logical cause of the harm or the immediate and direct cause of the injury; and where the cause of an injury or death is the negligent act of an independent responsible intervening agency, such act must be regarded as the proximate cause thereof and the original negligence considered as only the remote cause."

As reflected in the trial court's findings in the case at bar, the immediate and direct cause of Lawson's death was his own negli-

gent act as an independent responsible intervening agency. There is no dispute that the cause of Lawson's death was electrocution occasioned by his coming in contact with wires in the vicinity of the splices. However, the condition of the wires or their support does not necessarily establish the proximate cause of the injury. As we have stated before, "an act which merely furnishes a condition by which subsequent injury is made possible is not a proximate cause of such injury." *Galbreath v. Engineering Construction Corp.* (1971), 149 Ind.App. 347, 357, 273 N.E.2d 121, 127, *trans. denied. See Meadowlark Farms, Inc. v. Warken* (1978), 176 Ind.App. 437, 376 N.E.2d 122. The chain of events which ultimately led to Lawson's death were set in motion by Lawson and Ramsey, and this intervening, superceding force could not have been foreseen by PSI.

PSI had no knowledge or notice that Lawson and Ramsey were working around the raceway and attempting to remove the portion of the roof overhang which supported the raceway. On the day of the accident, all of the roof materials except for the plywood decking and roof rafters had already been removed. Side cuts made on both sides of the service raceway were made by Lawson and Ramsey, not PSI. Lawson placed himself on a ladder between the service raceway and PSI's service pole, directly underneath the wires. Lawson himself took the claw end of the hammer and scraped away the roof overhang from around the service raceway. None of these events could have been foreseen by PSI, and as such, the acts on the part of Lawson have intervened and superceded any original act or omission on the part of PSI so as to cut off the chain of causation attributable to PSI.

As a related matter, the acts on the part of Lawson also support the finding of the trial court that it was his own negligence which proximately caused his death. Assuming negligence on the part of PSI, the facts which are not in dispute show Lawson to be contributorily negligent. Contributory negligence is conduct on the part

of the plaintiff which falls below the standard of care to which he should conform for the protection of his own safety. *Hundt, supra.* It must also be shown that the negligent acts of the plaintiff were the proximate cause of his injury and that he was actually aware of or should have appreciated the risks involved. *Id.* The court in *Hundt* went on to note that a plaintiff is contributorily negligent as a matter of law where his voluntary conduct exposes him to imminent and obvious dangers which a reasonable man exercising due care for his own safety would have avoided.

■ Mrs. Lawson claims that Lawson and Ramsey looked and saw that the splices appeared to be insulated, and that they assumed the raceway was anchored by means other than by the roof overhang. However, it was obvious that the overhang did provide at least some support for the raceway. The exhibits consisting of photographs clearly reflect there were no other supports. Lawson and Ramsey proceeded by removing this form of support without determining whether there was any other support sufficient to withstand the tension of the wires without the aid of the overhang support. These actions and inactions on the part of Lawson and Ramsey fell below the standard of care to which they should have conformed for the protection of their own safety. *See Hundt, supra.* Lawson and Ramsey should have appreciated the risks involved, and by proceeding to remove the only visible means of support, they set in motion a chain of events which accelerated the fall of the raceway.

In conclusion we emphasize that the fatal flaw in Lawson's case is that of negligence and lack of causation. As indicated by the trial judge, it may be questionable whether any negligence existed on the part of PSI at all. Negligence is defined as conduct which falls below the standard established by law for the protection of others against *unreasonable* risks. PROSSER AND KEETON ON TORTS Sec. 31, at 169 (W. Keeton 5th ed. 1984). (Our emphasis.) We do not perceive that the ordinary, environ-

mental risks to which man is subjected in his daily life is encompassed in such definition. Thus being so, a serious question arises whether, under all of the facts here, any *unreasonable* risk was created.

■■ Next it is noted that the construction and maintenance of the raceway which fell and caused Lawson's death was the responsibility of the owner, not PSI, and the manner of the anchoring was plain. Assuming arguendo that certain aspects of the installation for which PSI was responsible were substandard, and that PSI was guilty of some negligence, such as old insulation, inspection, and the like, such negligence was not the cause of this tragedy. Lawson did not innocently come in contact with an uninsulated wire, nor was he unaware of the immediate presence of the electric line. The real, effective and immediate cause of the tragedy was the dismantling of the portion of the house by Ramsey and Lawson under, around, and about the raceway and electric line which permitted the whole apparatus to fall on Lawson. The words "proximate cause" mean near and immediate cause, not a remote cause. PROSSER AND KEETON ON TORTS Sec. 42, at 272 (W. Keeton 5th ed. 1984). Any negligence of PSI was remote. It is difficult to perceive in what practical manner the utility could furnish service to a property with complete safety where people persist upon dismantling the installation. In such endeavors some plaintiff working in and about volatile and lethal electric installations would find a way to injure himself regardless of what safety measures were undertaken by the utility. Reason should warn people to let electric installations alone unless they possess sufficient skill to work on them safely.

These events are not in dispute. Mrs. Lawson does not allege that any of the facts found by the trial court are in error or subject to conflicting inferences. Therefore, in light of our decisions above, we hold that PSI is entitled to summary judgment as a matter of law.

Judgment affirmed.

ROBERTSON, P.J., and BUCHANAN, C.J. (sitting by designation), concur.