**Elsie Lucille ROGERS, Individually, Widow of Weldon Lee Rogers, and as Personal Representative of Daniel Lee Rogers, Son of Weldon Lee Rogers, Appellant–Plaintiff,**

v.

**Owen GRUNDEN, Ruth Grunden, Dubois County Remc, Inc., and Public Service of Indiana, Appellees–Defendants.**

No. 59A05–9108–CV–254.

Court of Appeals of Indiana,
Fifth District.

March 30, 1992.

Rehearing Denied June 2, 1992.

could increase depending upon the purity of the rock cocaine.

Gary Becker, Becker Law Office, Louisville, for appellant-plaintiff.

Irvin H. Sonne, III, Tackett, Taurman & Sonne, P.C., New Albany, for appellees-defendants, Owen Grunden and Ruth Grunden.

J. William DuMond, PSI Energy, Inc., Plainfield, for appellee-defendant, Public Service Co. of Indiana, Inc.

Peter L. Obremskey, Carol Sparks Drake, Parr, Richey, Obremskey & Morton, Lebanon, Arthur C. Nordhoff, Jr., Jasper, Charles F. Perry, Farlow & Perry, Paoli, for appellee-defendant, Dubois County Rural Elec. Co-op., Inc.

RUCKER, Judge.

Elsie Lucille Rogers, the personal representative of Weldon Rogers' estate, (Representative) filed an action for wrongful death against Owen and Ruth Grunden (the Grundens), the Dubois County Rural Electric Cooperative, Inc. (REMC), and the Public Service Company of Indiana (PSI) (collectively referred to as "Defendants"). Defendants filed motions for summary judgment which the trial court granted. Representative now appeals the decision raising several issues for review which we consolidate and rephrase as:

1. Did the trial court err in granting summary judgment in favor of the Grundens?

2. Did the trial court err in granting summary judgment in favor of REMC?

3. Did the trial court err in granting summary judgment in favor of PSI?

We affirm in part and reverse in part.

In 1972, Owen and Ruth Grunden purchased a tract of rural land for farming purposes. Two uninsulated 7,200 volt power lines ran over the property. The power lines were positioned 26.5 feet and 27.5 feet above the ground, well above National Electrical Safety Code (NESC) and Indiana Utility Regulatory Commission regulations.

In 1978, the Grundens decided to build a grain bin on the property as part of their farming operations. Before building the bin, the Grundens contacted REMC with an inquiry to ensure that REMC could provide electrical service to the grain bin. When an REMC employee visited the site, the Grundens indicated the general vicinity of the prospective grain bin and the REMC employee selected the location of the pole to which the electric meter would be attached.

Soon, thereafter, the bin was constructed and REMC installed the pole and meter. The minimal horizontal distance between the bin and a point beneath the power lines was 55 feet. To the west side of the bin there existed an area of over several hundred feet which was free from overhead obstruction. The Grundens also purchased an auger, a farm instrument used to load and unload grain from the bin. This particular auger could be attached to a tractor and moved from one location to the other. Operating properly, the auger could be lowered to a height of approximately fifteen feet or raised to a height of approximately sixty feet.

From the installation of the meter until 1984, an REMC employee would visit the property every month to read the meter for billing purposes and to check the lines for violations. No violations were ever reported.

From 1978 until 1981, the Grundens used the bin and auger for their personal farming use and manipulated the auger without contacting the power lines. In 1981, the Grundens quit their farming activities and discontinued use of the bin and auger. In 1984, the Grundens leased the bin to Ramsey Popcorn Company (Ramsey) and have renewed the lease every year since that time.[1] In addition, the Grundens and Ramsey entered into an oral agreement which allowed Ramsey employees to use the auger at any time throughout the duration of the lease without obtaining the Grunden's permission or consent. *Record* at 207–08. Ramsey employees loaded and unloaded the bin two or three times a year using either the Grundens' auger or an auger owned by Ramsey.

In 1984, REMC relinquished to PSI control of the power lines over the Grundens' property. PSI continued to visit the property once a month for billing purposes and to check for regulatory violations. No violations were ever reported.

On April 7, 1986, Ramsey directed its employees Weldon Rogers and Kevin Baumgartle to unload corn from the grain bin on the Grundens' property. When the employees arrived, the auger was elevated in the loading position. In order to unload the bin, Rogers and Baumgartle needed to reverse the auger's position by moving the discharge end over the trailer and moving the intake end to the base of the bin. Rogers and Baumgartle attempted to lower the auger before moving it to its proper position but the auger would not move downward. Because the auger could not be lowered, the men attempted to move the auger to its proper position while the auger was in its fully elevated position.

The men chained the lower intake end of the auger to the front of the tractor and Baumgartle, driving the tractor, began backing up the tractor. Rogers held on to the lower end of the auger to keep it from damaging the tractor radiator. The men moved the auger into direct contact with the uninsulated 7,200 volt power lines. Rogers, who was in direct contact with the auger, was electrocuted.

Representative filed suit against the Grundens, REMC, and PSI under Indiana's Wrongful Death Statute.[2] At the time of filing, Representative's wrongful death claim was captioned, "Elsie Rogers, individually and as representative of Daniel Lee Rogers." Before the summary judgment proceedings, well after two years from the date of the accident, the trial court allowed Representative to amend the caption on the complaint to read, "Elsie Rogers as administratrix of Weldon Rogers' estate."

Representative appeals the trial court's grant of summary judgment in favor of the Grundens, REMC, and PSI.

When reviewing the propriety of ruling on a motion for summary judgment, this court applies the same standard applicable to the trial court. *Ayres v. Indian Heights Volunteer Fire Dep't, Inc.* (1986), Ind., 493 N.E.2d 1229. We must consider the pleading and evidence sanctioned by Ind. Trial Rule 56(C) without deciding its weight or credibility. *Id.* All evidence must be construed in favor of the nonmoving party. *Id.* Only if such evidence shows that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law should summary judgment be granted. *Id.*

---

1. At the time of the incident, the lease, in its entirety, read as follows:

> We, Ramsey Popcorn Co., Ind, agree to rent a bin from Owen Grunden for the sum of 1,200.00 [sic] from October 1, 1985 to October 1, 1986.
>
> /s/ Wilfred E. Sieg
> Wilfred E. Sieg, President

I, Owen Grunden, accept the above agreement.

> /s/ Owen Grunden
> Owen Grunden

*Record* at 209.

2. Ind.Code § 34–1–1–2.

We may affirm the summary judgment where this result is correct, although rendered upon a different theory than that upon which it was sustained, *i.e.*, summary judgment should be affirmed if sustainable on any theory or basis found in the record. *Howard v. H.J. Ricks Constr. Co., Inc.* (1987), Ind.App., 509 N.E.2d 201, *trans. denied.* Even if the facts or inferences conflict on some elements of a claim, summary judgment may be proper when there is no dispute regarding the facts which are dispositive of the litigation. *Bridgewater v. Economy Engineering Co.* (1985), Ind., 486 N.E.2d 484. The purpose underlying summary judgment procedure is to terminate those causes of action which have no factual dispute and which may be determined as a matter of law, thus eliminating undue burdens upon litigants and exposing spurious causes. *Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, *reh. denied,* 439 N.E.2d 666. The summary judgment procedure must be applied with extreme caution so that a party's right to a fair determination of a genuine issue is not jeopardized; mere improbability of recovery by a plaintiff does not justify summary judgment for the defendant. *Id.*

## I.

■ Representative contends the trial court erred in ordering summary judgment in favor of the Grundens. Specifically, Representative argues the trial court erred in finding the Grundens owed no duty to Rogers. Representative claims a duty exists because 1) the Grundens were the landowners of the property, 2) the Grundens leased a defective auger to Ramsey, and 3) the Grundens supplied the auger, regard-less of its condition, for use in close proximity with the power lines.

In order to sustain an action for negligence, Representative must prove: duty on the part of the defendant to conform its conduct to a standard of care arising from a relationship with the plaintiff, breach of that duty, and injury to plaintiff resulting from breach. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992. Thus, the initial question is whether a duty was owed to Rogers by the Grundens.

■ The existence of duty is a question of law for the court to determine and depends upon the relationship between individuals which imposes upon the defendant a legal obligation for the benefit of the particular plaintiff. *Webb, supra.* Here, Representative argues the relationship between the Grundens and Rogers gave rise to such a duty.

In support of her argument, Representative cites to Indiana cases imposing on a landlord a duty of care to persons upon landowners' property. *Daben Realty Co., Inc. v. Stewart* (1972), 155 Ind.App. 39, 290 N.E.2d 809 (held landowner owed tenant duty to exercise ordinary care to keep leased building and its means of egress and ingress in a reasonably safe condition); *Coleman v. DeMoss* (1969), 144 Ind.App. 408, 246 N.E.2d 483 (held landlord has a duty to keep and maintain in reasonably safe condition those areas over which he retains control). In addition, Representative cites to Section 388 of the Restatement (Second) of Torts which imposes a duty on those who supply chattel in a defective condition [3] and Section 389 which imposes a duty on those who supply defective chattel and know or reasonably should know it will

---

3. § 338. Chattel Known to be Dangerous for Intended Use

 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
 (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
 (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
 (c) fails to exercise reasonable care to inform them, of its dangerous condition or of

not be made safe before being put to use.[4] We are not persuaded.

We note Sections 388–89 of the Restatement (Second) of Torts have not been adopted by the courts of this state. *See Stapinski v. Walsh Constr. Co., Inc.* (1979), 272 Ind. 6, 395 N.E.2d 1251, 1254 ("We neither accept nor reject, as a general proposition, the adoption, as the law of Indiana, the Restatement (Second) of Torts § 388 (1965) by the Court of Appeals."); *Cf. Louisville Cement Co. v. Mumaw* (1983), Ind.App., 448 N.E.2d 1219 (held § 388 does not apply). Representative cites no authority from this jurisdiction applying § 389 nor does our research reveal any such authority.

 The law of this jurisdiction is clear; as a general rule, in the absence of statute, covenant, fraud or concealment, a landlord who gives a tenant full control and possession of the leased property will not be liable for personal injuries sustained by the tenant or other persons lawfully upon the leased property. *Pitcock v. Worldwide Recycling* (1991), Ind.App., 582 N.E.2d 412. Generally, once possession and control of property have been surrendered, a landlord does not owe a duty to protect tenants from defective conditions. *Hodge v. Nor–Cen, Inc.* (1988), Ind.App., 527 N.E.2d 1157, *trans. denied.*

Exceptions to this general rule governing landlord liability exist. For example, a landlord may be held liable for personal injuries caused by latent defects known to the landlord but unknown to the tenant and which the landlord fails to disclose. *Zimmerman v. Moore* (1982), Ind.App., 441 N.E.2d 690. A tenant may recover for injuries due to defective condition on the rented property if the landlord agreed to make repairs or was negligent in making

repairs. *Id.* A landlord has a duty to maintain in a safe condition parts of a building used in common by tenants and over which landlord retains control. *Slusher v. State* (1982), Ind.App., 437 N.E.2d 97, *reh. denied.* Finally, a landlord may be liable to a tenant because of negligence which arises from the violation of a duty imposed by a statute or ordinance. *Ray v. Goldsmith* (1980), Ind.App., 400 N.E.2d 176.

On a motion for summary judgment, it is not necessary for the Grundens, as moving parties, to support their motion with "affidavits or other similar materials *negating* the opponent's claim" *Celotex Corp. v. Catrett* (1986), 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 272 (emphasis in original); *See Watson Rural Co., Inc. v. Indiana Cities Water Corp.* (1989), Ind. App., 540 N.E.2d 131, 139, *trans. denied.* Rather, Representative, as opponent of the motion for summary judgment, must respond by affidavit or otherwise set forth specific facts, as opposed to unsubstantiated theories, showing there is a genuine issue for trial. *Tucher v. Brothers Auto Salvage Yard* (1991), Ind.App., 564 N.E.2d 560, 563, *trans. denied.* If the nonmovant fails to meet this burden, summary judgment is appropriate. *Id.*

Here, Representative failed to demonstrate specific facts showing the Grundens owed a duty to Rogers under any cognizable legal theory. The Grundens leased the bin to Ramsey and entered into an oral agreement allowing Ramsey to use the land and the auger as Ramsey and its employees saw fit. Because Ramsey exercised complete discretion and control over the auger, the bin, and the land, no duty arises from the relationship between the

the facts which make it likely to be dangerous.

**4.** § 389 Chattel Unlikely to be Made Safe for Use

One who supplies directly or through a third person a chattel for another's use, knowing or having reason to know that the chattel is unlikely to be made reasonably safe before being put to use which the supplier should expect it to be put, is subject to liability for

physical harm caused by such use to those whom the supplier should expect to use the chattel or to be endangered by its probable use, and who are ignorant of the dangerous character of the chattel or whose knowledge thereof does not make them contributorially negligent, although the supplier has informed the other for whose use the chattel is supplied of its dangerous character.

Grundens and Rogers, an employee of Ramsey.

The trial court did not err in granting summary judgment in favor of the Grundens.

## II.

■ Representative asserts the trial court erred in granting summary judgment in favor of REMC. Representative claims REMC's liability is predicated upon the negligence of REMC employees who agreed to install a meter pole near the proposed grain bin. Relying on the Restatement (Second) of Torts § 324A, Representative asserts REMC breached an assumed duty of responsibility for safety at the site by failing to warn the Grundens of potential dangers, failing to properly insulate the lines, or failing to change the location of the lines.

■ One who no longer has possession and control of property should normally not be liable for injuries arising therefrom, because he is no longer in a position to prevent these injuries. *Zimmerman, supra; Great Atlantic & Pacific Tea Co., Inc. v. Wilson* (1980), Ind.App., 408 N.E.2d 144. REMC transferred possession and control of the power lines at issue in this case to PSI in 1984, more than two years prior to Rogers' electrocution. REMC owed no duty to Rogers.

Representative argues a duty nonetheless exists under the assumed duty doctrine articulated in § 324A of the Restatement (Second) of Torts. According to Representative, REMC's duty arose from gratuitously undertaking to render services to the Grundens which were necessary to protect Rogers from physical harm. Section 324A of the Restatement (Second) of Torts provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> a. his failure to exercise reasonable care increases the risk of such harm, or

> b. he has undertaken to perform a duty owed by the other to the third person, or

> c. the harm is suffered because of reliance of the other or the third person upon the undertaking.

*See Sports, Inc. v. Gilbert* (1982), Ind.App., 431 N.E.2d 534. This "assumed duty" doctrine is law in this jurisdiction. *Perry v. Northern Indiana Public Service Co.* (1982), Ind.App., 433 N.E.2d 44, *reh. denied.*

The authority predicating liability based on the assumed duty doctrine is readily distinguishable from the facts of this case. For example, in *Perry, supra,* a plaintiff was injured while working on a construction site and NIPSCO safety supervisors did not aid him. The court held against NIPSCO, indicating NIPSCO had assumed the obligation to enforce the safety measures at the job site by having six to thirty "safety supervisors" on site and by conducting regular safety meetings for employees of subcontractors. No analogous facts are present in this case. In *Jones, supra,* the defendant furnished a project representative at the construction site and this court acknowledged that the defendant could have assumed a duty of care regarding worker safety through its affirmative conduct.

In the case before us, Representative has failed to show REMC assumed a duty concerning the ongoing safety of the site. Absent a duty, no negligence can lie. *Webb, supra.* Summary judgment was properly entered in favor of REMC.

## III.

Representative asserts the trial court erred in granting summary judgment in favor of PSI. Representative claims PSI owed a duty to Rogers to insulate, barricade, bury or otherwise warn of the uninsulated power lines. PSI asserts it had no duty to insulate or otherwise additionally treat the power lines and concludes the

trial court's summary judgment in PSI's favor was without error.

This jurisdiction does not impose strict liability on electric utilities for accidents involving their overhead electric lines even though electricity has been recognized as a dangerous entity, *Hedges v. Public Service of Indiana, Inc.* (1979), Ind. App., 396 N.E.2d 933, *reh. denied*, nor must electric utilities exercise the highest degree of care or utmost care. *Jones v. City of Logansport, supra.* Instead, electric utilities have a duty to exercise such care as a person of reasonable prudence would use under like conditions and circumstances. *Pilkington v. Hendricks County Rural Elec. Membership Corp.* (1984), Ind. App., 460 N.E.2d 1000.

Companies engaging in the generation and distribution of electricity have a duty to exercise reasonable care to keep distribution and transmission lines safely insulated in places where the general public may come into contact with them. *Brown v. Northern Indiana Public Service Co.* (1986), Ind.App., 496 N.E.2d 794, *trans. denied*, citing *Petroski v. NIPSCO* (1976), 171 Ind.App. 14, 354 N.E.2d 736, 741; *Pilkington, supra.* Conversely, insulation is not required when lines are sufficiently isolated so that the general public could not reasonably be anticipated to be dangerously close to the lines. *Brown, supra*, citing *Jones, supra.* "General public" has been defined by this court as a person of that " 'great multitude of persons' who would, in the course of daily events, be exposed to danger by the presence of an uninsulated wire carrying a dangerous voltage of electricity." *Brown*, 496 N.E.2d at 797 quoting *Jakob v. Gary Railways, Inc.* (1947) 118 Ind.App. 13, 70 N.E.2d 753, 754.

In this case, Rogers was present on the private property leased by his employer, an area to which the general public had no access. Additionally, Rogers' exposure to the power lines occurred as a result of his using a sixty foot auger in close proximity to the lines. This is not conduct usually considered a part of the normal course of daily events. The power lines at issue in this case were properly suspended, in compliance with NESC standards, and could not cause danger to a person engaged in normal activity on the ground. Because the power lines were not located in a place where the general public would come into contact with them, PSI owed no duty to insulate or otherwise treat the lines under the "general public" rule.

On the other hand reasonable care demands insulation of wires when a utility knows or has knowledge of such facts from which it should know that a "particular segment" of the population will be regularly exposed to the wires for one reason or another. In *Brown, supra*, a construction worker was injured by an electrical shock when the crane he was operating came into contact with uninsulated overhead power lines. This court concluded:

> [T]here are material issues of fact regarding whether NIPSCO knew or should have known that the height and location of its uninsulated power lines across the Dedelow construction yard posed a danger to which Dedelow employees, like Brown, would be regularly exposed....

*Brown*, 496 N.E.2d at 798. The *Brown* court affirmed the trial court's denial of summary judgment in favor of NIPSCO.

The undisputed facts of this case show the minimum horizontal distance from the grain bin to the power lines was fifty-five feet, *Record* at 779, the distance between the burn point and the bin was sixty-five feet, *Record* 778–79, the sixty foot auger was used for loading and unloading the bin two or three times a year, *Record* at 708, that a PSI employee or employees visited the site once a month for the purpose of reading the electrical meter on the bin, *Record* at 750, and that PSI supervisors checked the site for compliance with NESC regulations in 1984 and drove by the lines several times thereafter. *Record* at 730–31. Even when facts are not in dispute, if any inference from those facts can be drawn in favor of the nonmovant, we must do so. *Brown*, 496 N.E.2d at 796. Here, the inference can be made that

PSI knew or should have known the location of its uninsulated power lines across the Grundens' property posed a danger to which workmen using the auger would be regularly exposed. Resolution of these facts are not amenable to summary disposition as a matter of law. Accordingly, the trial court erred in granting summary judgment in favor of PSI.

### IV.

■ Because we must sustain summary judgment if it is supported by any theory on the record, we address PSI's alternative arguments in support of affirmance. PSI argues the trial court's order granting summary judgment in favor of PSI should be affirmed because PSI's conduct was not the proximate cause of Rogers' death. PSI claims Representative's allegations of PSI's negligence, even if taken as true, simply involve prior, passive or remote conditions which were not the proximate cause of the accident. In support, PSI relies on two cases, *Lawson v. Public Service Co. of Ind., Inc.* (1986), Ind.App., 493 N.E.2d 815, *trans. denied,* and *Thompson v. Public Service Co. of Indiana, Inc.* (1986), Ind. App., 499 N.E.2d 788, *trans. denied.* In both *Lawson, supra,* and *Thompson, supra,* this court affirmed summary judgment in favor of electric companies because the injury to the plaintiff in each case was not proximately caused by the acts or omissions of the electric company.

■ Generally, proximate cause is a question of fact; it becomes a question of law "only in plain and undisputable [sic] cases." *Rubin v. Johnson* (1990), Ind. App., 550 N.E.2d 324, *trans. denied.* For an act to constitute the proximate cause of an injury, the injury must be a natural and probable consequence which, in light of the circumstances, should reasonably have been foreseen or anticipated. *Id.* The facts of this case, unlike the facts presented in *Lawson, supra* and *Thompson, supra,* are not plain and indisputable.

In *Lawson,* the plaintiff attempted to remove a part of the roof, which was buckled and rotted, to which bare electric lines were attached. When the roof broke away from the house, the electric service raceway fell on top of Lawson and he was electrocuted. This court determined that Lawson's conduct intervened and superseded any original act or omission on the part of the electric company so as to cut off the chain of causation attributable to the electric company. *Lawson,* 493 N.E.2d at 818. In *Thompson,* plaintiff received an electric shock after climbing a utility pole to chase a raccoon. We held the electric company defendants could not have reasonably foreseen that Thompson would strap on steel pole climbers and scale the utility pole to chase an animal. *Thompson,* 499 N.E.2d at 791. We also held the defendants' maintaining an uninsulated exposed ground wire on a utility pole was not the proximate cause of Thompson's injuries. *Id.*

In contrast to the facts presented in *Lawson* and *Thompson,* the record here reveals PSI had an opportunity to observe the potential danger of a workman operating a sixty-six foot movable auger in close proximity to the power lines positioned 26–28 feet above the ground. Consequently, the evidence before the trial court raises a genuine issue of fact concerning whether the acts or omissions of PSI was the proximate cause of Rogers' death. In this instance we view the question of foreseeability and proximate cause as factual determinations better left to a fact finder's deliberation.

■ PSI also argues the trial court's order of summary judgment should be affirmed because Rogers' contributory negligence exceeded the fault of all others whose fault proximately contributed to his death. In support, PSI directs our attention to the Comparative Fault Act, Ind. Code § 34–4–33–4(b), which provides a complete defense to PSI if Rogers' contributory fault is "greater than the fault of all persons whose fault proximately contributed to the claimant's damages." *Id.*

■ Contributory negligence is conduct on the part of the plaintiff that falls below the standard to which he should conform for his own protection and safety. *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205.

Contributory negligence is generally a question of fact for the jury unless the material facts are undisputed. Only when a single inference can be reasonably drawn from such facts will contributory negligence be a question of law appropriate as a basis for summary judgment. *Id.* Further, contributory negligence cannot be inferred from the mere fact that one chooses a more dangerous method of working when a safer method is available. *Meadowlark Farms, Inc. v. Warken* (1978), 176 Ind. App. 437, 376 N.E.2d 122. One is not contributorially negligent merely because he sees power lines and works near them. *Central Union Telephone Co. v. Sokola* (1905), 34 Ind.App. 429, 73 N.E. 143.

In the case before us, there were no warning signs indicating the overhead lines were bare uninsulated power lines. In fact, some of the lines were harmless cable television and telephone lines. Based on the facts of this case, a fact finder could reasonably conclude Rogers thought the lines were harmless because of their relatively close physical proximity to the auger and bin. We decline to hold Rogers was contributorially negligent as a matter of law.

Further, even if Rogers were contributorially negligent, it does not follow that his contributory fault exceeded the fault of PSI. In order that contributory fault bar recovery under the Comparative Fault Act, the fault of the plaintiff must be greater than that of "all persons whose fault proximately contributed" to Rogers' death. I.C. § 34–4–33–4(b). Neither this court nor the trial court may speculate on the percentage of fault, if any, a trier of fact may have assigned to Rogers, PSI, or a non-party. *Dep't of Public Welfare v. Couch* (1992), Ind.App., 585 N.E.2d 1337. We decline to hold Rogers contributorially negligent as a matter of law.

Finally, PSI argues summary judgment should be affirmed because the trial court erred in allowing the Representative to amend her complaint, more than two years after Rogers' death, from "Elsie Lucille Rogers, individually, widow of Weldon Lee Rogers and as personal representative

of Daniel Lee Rogers, son of Weldon Lee Rogers" to "Elsie Lucille Rogers, Administratrix of the Estate of Weldon Lee Rogers, deceased." PSI notes that neither the original complaint nor the amended complaint affirmatively identify Elsie Lucille Rogers as the personal representative of Weldon Rogers.

In support of its contention PSI cites *General Motors Corp. v. Arnett* (1981), Ind.App., 418 N.E.2d 546, *trans. denied,* which held a widow who was not appointed as decedent's personal representative until more than two years after his death could not have her appointment as representative "relate back" to the original complaint. PSI's argument is not persuasive.

Indiana's wrongful death statute grants the right to maintain a wrongful death action only to the personal representative of the decedent. *Blusy v. Rugh* (1985), Ind.App., 476 N.E.2d 874, *trans. denied.* The wrongful death statute provides, in pertinent part:

> When the death of one is caused by the wrongful act or omission of another, the personal representative of the former may maintain an action therefor against the latter ... the action shall be commenced by the personal representative of the decedent within two (2) years, [of decedent's death] ...

Ind.Code § 34–1–1–2.

The nature of an action is determined by its substance, not its caption or formal denomination. *English Coal Co., Inc. v. Durcholz* (1981), Ind.App., 422 N.E.2d 302. Here, the record reveals Rogers died on April 7, 1986. Elsie Lucille Rogers qualified as personal representative of Rogers on November 9, 1987. On March 4, 1988, Representative filed her wrongful death action. Thus, Elsie Lucille Rogers was the personal representative of Weldon Rogers at the time she filed the complaint and she did so within two years of Rogers' death. The trial court did not err in granting the motion to amend the complaint.

The trial court's grant of summary judgment in favor of the Grundens and REMC is affirmed and the summary judgment in favor of PSI is reversed.

AFFIRMED IN PART AND RE-
VERSED IN PART.

BARTEAU and MILLER, JJ., concur.