**Jeffrey B. RAMON and Michelle Ramon, Appellants–Plaintiffs,**

**Grunau Company, Inc., d/b/a Grunau Mechanical Contractors, Appellant– Defendant**

**v.**

**GLENROY CONSTRUCTION COMPA- NY, INC., Huber Hunt & Nichols, Inc., Ceco Corporation, Appellees–Defen- dants.**

No. 54A01–9206–CV–181.

Court of Appeals of Indiana, First District.

March 3, 1993.

Transfer Denied May 18, 1993.

---

Peter B. Stewart, William N. Ivers, Stewart & Irwin, Indianapolis, Larry S. Pugh, Stewart Due Miller & Pugh, Indianapolis, for appellants-plaintiffs.

James L. Petersen, Teresa E. Kofodimos, Ice Miller Donadio & Ryan, Peter A. Schroeder Norris, Choplin & Schroeder, William H. Vobach, Nicholas C. Pappas, Locke Reynolds Boyd & Weisell, Indianapolis, for appellees-defendants.

ROBERTSON, Judge.

Jeffrey B. Ramon, his wife, Michelle Ramon, and Grunau Company, Inc. (Grunau), a defendant below, appeal the entry of summary judgments in favor of contrac-

tors, Glenroy Construction Company, Inc. (Glenroy), Huber Hunt & Nichols, Inc. (HHN), and Ceco Corporation (Ceco), in Ramon's action against the contractors for injuries he sustained while working at the site of the Indiana State Office Building II parking facility, a multi-prime contractor project.

We affirm.

On October 10, 1989, Ramon had been moving tool boxes for Grunau Fire Protection, Inc., his employer and a subcontractor under Grunau, when he encountered a piece of plywood in his path, kicked the plywood aside and fell through an uncovered manhole into a concrete chill water tank, resulting in injury. The parking facility project had no single general contractor who was to be responsible for seeing the project through to completion. Glenroy, HHN and Grunau were each prime contractors. Ceco was a subcontractor of Glenroy.[1]

 The trial court disposed of Ramon's claims against Glenroy, HHN and Ceco on the ground that these contractors owed no duty of care to Ramon. Grunau also moved for summary judgment but its motion was denied. Grunau now joins Ramon in arguing that summary judgment was inappropriately entered in favor of the appellee contractors.[2]

 On appeal from the grant or denial of summary judgment we use the same standard in ascertaining the propriety of summary judgment as does the trial court.

*Newhouse v. Farmers National Bank of Shelbyville* (1989), Ind.App., 532 N.E.2d 26, 28. In summary judgment proceedings, the trial court is called upon to derive the matters placed in issue from the pleadings and to examine the forms of admissible evidence sanctioned by Ind.Trial Rule 56(C) which have been made available by the parties. *Burke v. Capello* (1988), Ind., 520 N.E.2d 439, 440. The probative value of each piece of evidence is then to be determined without setting weight or credibility. *Id.* Rational assertions of fact and reasonable inferences therefrom are deemed to be true. *Id.* Summary judgment is appropriate when the evidentiary matter designated by the parties shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. T.R. 56(C).

 The movant bears the burden of establishing the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed in a light most favorable to the non-movant. *Newhouse*, 532 N.E.2d at 28; *Norman v. Turkey Run Community School Corp.* (1980), 274 Ind. 310, 411 N.E.2d 614. When evidence presented by the movant establishes a lack of any genuine issue of material fact, however, the non-movant may not rest upon the mere allegations or denials of his pleadings but must respond by affidavit or by other appropriate evidence, setting forth specific facts to show a genuine issue for trial. *Kerr v. Carlos* (1991), Ind.App., 582

---

1. The chill water tank into which Ramon fell had been constructed by Grunau, Glenroy, Ceco and Duffee Forms. It was Glenroy's general responsibility to install the tank. Ceco had responsibility as Glenroy's subcontractor for constructing the horizontal deck or roof of the tank. Grunau was responsible for installing piping in the tank. HHN was responsible for pouring the topping slab over the tank which was the driving surface of the garage floor. Glenroy supplied the manhole covers which were put in place by HHN around August 8, 1989.

2. Glenroy, HHN and Ceco have each objected to Grunau's submission of an appellant's brief. Without discussing each of the theories raised by the individual appellees for striking Grunau's brief or Grunau's response to them, we observe simply that pursuant to Ind.Trial Rule 56(H), no summary judgment rendered on a motion may

be reversed on the ground that there is a genuine issue of material fact unless the material fact and the evidence relevant thereto shall have been specifically designated to the court. Grunau did not state any objections to the other defendants' motions for summary judgment, designate genuine issues of material fact which would preclude the entry of summary judgment in favor of any of the other defendants or direct the trial court to the evidence relevant to those issues. To the extent, then, that Grunau's brief discloses a genuine issue of material fact not designated by Ramon, reversal may not be predicated upon it. A party cannot change its theory and on appeal argue an issue which was not properly presented to the trial court. *Franklin Bank & Trust Co. v. Mithoefer* (1990), Ind., 563 N.E.2d 551, 553.

N.E.2d 860, 865. The failure of the non-movant to offer evidence in opposition to the undisputed facts shown by the evidentiary materials or designate facts establishing a question of fact for trial will permit summary judgment to be entered against him. *Babinchak v. Town of Chesterton* (1992), Ind.App., 598 N.E.2d 1099, 1102. This court is not precluded from affirming a summary judgment where the final result is correct although it may have been rendered upon a different theory than that upon which we sustain it. *Howard v. H.J. Ricks Construction Co.* (1987), Ind.App., 509 N.E.2d 201, 204.

In order to prevail in a negligence action, the plaintiff must provide evidence sufficient to demonstrate the existence of all the requisite elements of a cause of action. *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324, 329, *trans. denied.* Hence, a defendant in a negligence action may obtain summary judgment by demonstrating that the undisputed material facts negate at least one element of the plaintiff's claim. *Id.* at 328.

 The contractors maintain that the undisputed facts establish they had no relationship with Ramon from which an obligation might have arisen to conform their conduct to the standard of reasonable care for the benefit of Ramon. The question of whether the law recognizes such an obligation is a legal one for the court. *Webb v. Jarvis* (1991), Ind., 575 N.E.2d 992, 995. However, Indiana law recognizes that a factual question may be interwoven with the determination of the existence of a relation, making the ultimate question of the existence of a duty a mixed question of law and fact. *Clyde E. Williams & Associates v. Boatman* (1978), 176 Ind.App. 430, 375 N.E.2d 1138, 1141. A duty might exist, then, if a certain set of facts is found. *Northern Indiana Public Service Co. v. East Chicago Sanitary District* (1992), Ind.App., 590 N.E.2d 1067, 1072.

 At common law, one is not liable for the acts or negligence of another unless the relation of master and servant exists between them. *Perry v. Northern Indiana Public Service Co.* (1982), Ind. App., 433 N.E.2d 44, 46. Consequently, each prime contractor may be fully responsible for the conduct of work to be performed under its individual contract with the owner, but a prime contractor has no responsibility or authority over work proceeding under the authority of another self-governing prime contractor. *See Teitge v. Remy Construction Co.* (1988), Ind.App., 526 N.E.2d 1008; *Walters v. Kellam & Foley* (1977), 172 Ind.App. 207, 360 N.E.2d 199. As a general rule, a prime contractor is not responsible for injuries to employees of its negligent independent subcontractor. *Lewis v. Lockard* (1986), Ind.App., 498 N.E.2d 1024, 1027, *trans. denied; Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, 1147.

 However, a party may be charged with a specific nondelegable duty by law or contract. *Id.* It may also be charged with a duty to use due care in the enforcement of safety regulations, a duty owed by the employer to his employee, where the party has by its conduct voluntarily assumed control of the supervision of safety at the site.[3] *Perry*, 433 N.E.2d at 49; *Boatman*, 375 N.E.2d at 1141.

Indiana has adopted as its own all federal occupational safety and health standards. Ind.Code 22-8-1.1-13.1. In addition, the General Assembly has mandated that every *employer* furnish employment that is safe, furnish and use safety devices, safeguards, methods, and processes which

---

**3.** The cases state that there are five exceptions to the general rule of nonliability. A duty has been imposed against a landowner or occupier of land for the benefit of third persons (1) where the contract requires the performance of work intrinsically dangerous; (2) where a party is by law or contract charged with a specific duty; (3) where the act will create a nuisance; (4) where the act to be performed will probably cause injury to others unless due precaution is taken to avoid harm; and (5) where the act to be performed is illegal. *Perry v. Northern Indiana Public Service Company* (1982), Ind. App., 433 N.E.2d 44, 47. At common law, one who no longer has possession and control of property should normally not be liable for injuries arising therefrom, because he is no longer in a position to prevent those injuries. *Rogers v. Grunden* (1992), Ind.App., 589 N.E.2d 248, 255, *trans. denied.*

are reasonably adequate to render employment and a place of employment safe, and do every other thing reasonably necessary to protect the safety of the employee. I.C. 22–1–1–10. The commissioner of labor has been authorized and directed to

> investigate and adopt rules ... prescribing what safety devices, safeguards, or other means of protection shall be adopted for the prevention of accidents in every employment or place of employment, to determine what suitable devices, safeguards, or other means of protection for the prevention of industrial accidents ... shall be adopted and followed in any or all employments or places of employment, and to adopt rules ... applicable to either employers or employees, or both, for the prevention of accidents ...

I.C. 22–1–1–11(1).

▆ At the time of Ramon's accident, standards adopted by the Indiana Commissioner of Labor pursuant to this authority had been repealed. 11 I.R. 1784 (January 15, 1988). Since Ramon's injury did not occur until October 10, 1989, no right to a cause of action based upon these regulations had vested in him. *Martin v. Simplimatic Engineering Corp.* (1979), 181 Ind. App. 10, 390 N.E.2d 235, 237. Thus, the numerous cases interpreting and applying these regulations, including *Stevens v. Thompson* (1988), Ind.App., 525 N.E.2d 353, cited by Ramon, are inapposite. None of these cases, in any event, imposed a statutory duty on a subcontractor of a second prime contractor, such as Ceco, as opposed to a general contractor with authority over the entire project.

Federal standards adopted pursuant to I.C. 22–8–1.1–13.1, IOSHA, have been construed to apply only to the immediate employer of an injured employee. *See e.g. Skidmore v. Travelers Ins. Co.* (E.D.La., 1973), 356 F.Supp. 670, 672, *affirmed,* 483 F.2d 67. Only Grunau Fire Protection, Inc. meets that definition as Ramon's employer. More importantly, IOSHA specifically precludes a private right of action based upon the regulations. I.C. 22–8–1.1–48.1.

▆ Whether I.C. 22–1–1–10 provides a basis for imposing a duty in the multi-

prime contractor context is a question not easily answered by the case law because the cases all involve application of the regulations which have been repealed. Moreover, while I.C. 22–1–1–11 has been construed to authorize regulations imposing upon prime contractors a duty to ensure compliance with safety regulations for the protection of all workers on a job site, *Maynard v. Flanagin Brothers, Inc.* (1985), Ind.App., 484 N.E.2d 71, (Staton, J. and Garrard, J. concurring), *on rehearing,* 490 N.E.2d 1147, *trans. denied,* I.C. 22–1–1–11, like its federal counterpart, speaks only of employers and "places of employment." Third parties having a direct contractual relationship with the property owner and owner/occupiers of property have had no statutory duties imposed as a consequence of this section. These parties had no right to control or interdict unsafe practices. *See e.g. East Chicago Sanitary District,* 590 N.E.2d 1067 (Garrard, J. and Staton, J. concurring) (engineering firm responsible for assuring construction conformed to authorized plans, which had direct contractual relationship with awarding unit, had no statutory obligation); *Robinson v. Kinnick* (1989), Ind.App., 548 N.E.2d 1167, *trans. denied,* (Property owners/contractees who were not an employer of independent contractor not charged with specific duty to provide a safe work place); *Clem v. Steveco, Inc.* (1983), Ind.App., 450 N.E.2d 550 (Degree of control retained by franchisor over workplace question not properly disposed of by 12(B)(6) motion); *Simplimatic Engineering Corp.,* 390 N.E.2d at 239 (Manufacturer of allegedly defective conveyor belt system used in workplace not employer) and *see, Teitge,* 526 N.E.2d at 1013 n. 7 (Staton, J. and Garrard, J. concurring) (referring to *Jones v. City of Logansport,* 436 N.E.2d at 1143, and *Harris v. Kettelhut Construction, Inc.* (1984), Ind.App., 468 N.E.2d 1069, *trans. denied,* in case involving prime as opposed to general contractor, as not on point).

We can only reconcile the cases and law as we find them today in this way. *Maynard v. Flanagin Brothers* held no more

than that the commissioner of labor had the authority to regulate safety practices in the workplace and to hold a prime contractor responsible for compliance with safety regulations to the extent imposed by the regulations in effect at the time. Under those regulations, in the event there was more than one prime contractor on a project, each was responsible for compliance with the Code (and concomitantly had a duty pursuant to I.C. 22–1–1–10), when compliance with safety regulations came "within the area of his jurisdiction." This perhaps explains why no statutory duty was imposed upon the engineering firm in *East Chicago Sanitary District*, presumably a prime contractor as that term had formerly been defined. The engineering firm's "jurisdiction," while continuous, extended only to ensuring that the project comported with specifications.

Accordingly, we come to the same conclusions concerning the law as the trial court did. The designated materials offered by the contractors establish that, of the defendant contractors, only Grunau by virtue of its contractual relationship with the awarding unit and its overall responsibility for work to be performed by its subcontractor, had jurisdiction over the work which was proceeding at the time of Ramon's injury. Each of the others had completed its assignment, with the exception of minor corrections found later, and had relinquished authority over the area over a

month before Grunau and its subcontractor, Ramon's employer, took control.

The uncontradicted evidence establishes that at the time Ceco and Glenroy relinquished control to HHN, the next contractor with work to be performed in the area, the manhole covers had been installed and each was in place. This final inspection occurred on August 29, or the morning of August 30, 1989. HHN had no work or responsibility inside the chill tank or for its construction. HHN was responsible for pouring and grading the finish slab over the top of the chill tank. Neither it nor its subcontractors needed access to the tank once the manholes had been installed in early August, 1989. HHN poured the finish slab over the knock-out panel, the last opening other than the manholes in the tank, on August 30, 1989, within hours of Glenroy's final inspection. A rational inference may be drawn from this evidence that when HHN too relinquished control over the chill tank, the manhole cover placed on the hole through which Ramon fell had not been removed, as HHN's sole reason for even being in the area was to pour finish slab over the access panel which had already been enclosed with concrete.[4]

To withstand a summary judgment on this theory, then, it devolved upon Ramon to come forward with facts demonstrating that each of the contractors retained jurisdiction over the workplace where Ramon

---

**4.** The affidavit of Roger Gilliland, foreman for Grunau, establishes, and a contemporaneous letter from HHN to Grunau affirms, that the manhole covers were put in place by HHN on August 8, 1980 while work was still in progress on the tank. Gilliland states that he personally supervised and assisted in the installation of the covering for each chamber. The affidavit and deposition of William Blevins, Vice President for Glenroy, establishes that Glenroy's pour over the access or knock-out panels to the tank was completed on August 23, 1989 and that Ceco removed its forms for the panels on August 28, 1989. With the exception of the finish slab over the access panels, construction of the tank itself was completed at this time. Carpenter foreman for Ceco, Howard Fortune, and construction superintendent for Glenroy, George Meyer, personally conducted an inspection together "to see that everything was back in place when [they] left the area, particularly the manhole covers."

Fortune and Meyer each aver that on August 29 or 30, 1989, every single manhole cover for the chill tank was fitted in place over its particular manhole and there were no open manholes. In fact, they saw the cover being placed on the hole in which Ramon fell. (R. 1200, 1219, 1234.)

According to HHN Vice President Mack Furlow, the activity of setting the manholes, installing the manhole covers and pouring the topping slab was completed by August 30, 1989. HHN notified Grunau on August 8, 1989, that the manhole covers had been set in place and Grunau became responsible for replacing them if its employees removed any of them. From August 31, 1989 through October 10, 1989, no HHN employee had reason to enter the tank and no work was performed by HHN in that area. After August 30, 1989, and through October 11, 1989, Glenroy had no job-related work activity in the area.

was injured. Ramon responds in four ways: first, that a prime contractor's jurisdiction is continuous until its work has been accepted by the awarding unit because there is no clear line of demarcation between contractors who share the same workspace; second, that the contractors had not relinquished control as they claim because each had punch list items or reasons to return to the work site; third, that the circumstantial evidence establishes that, regardless of whether any of the contractors retained jurisdiction over the site, when the contractors departed they left the premises in an unsafe condition; and fourth, the evidence raises a question of credibility which should be resolved by a trier of fact.

■ The evidence shows that construction work is accepted by the awarding unit when a system has been completed and is operational. The chill tank was not ready for inspection and acceptance until October, 1990. As was the case here, any number of contractors may play a role at some time in creating or implementing a system; no single contractor is necessarily responsible for a single system.

Therefore, were prime contractors to retain jurisdiction long after their work has been completed and until all other work on a particular portion of a project has been completed so that an entire system could be accepted, multiple contractors would be required to supervise safety precautions employed in a workplace no longer under their direct tutelage. At least two cases have pointed out the irrationality of such an arrangement. The cost of avoiding or insuring against potential liability would be entirely out of proportion to the anticipated profits from the job, particularly with respect to subcontractors. "Chaos would reign supreme on any job on which several sub-contractors with divergent concepts of safety might take seriously their supposed duty to supervise the safety practices of the general contractor and of each other." *Wyler v. Lilly Varnish Co.* (1969), 146 Ind.App. 91, 252 N.E.2d 824, 834. *See also Teitge*, 526 N.E.2d at 1011 (applying the same rationale to multiple prime contractors).

What's more, this is a case where there is a clear line of demarcation. Each of the contractors can say categorically when they relinquished control of the workplace to the next.

■ Ramon argues that there is at least a question of fact as to whether the contractors relinquished control because each had punch list items or other reasons to return to the work site. Ramon points to the fact that Ceco had not yet picked up the forms it used for the access panels from the area when Ramon was injured. While the removal of these materials may have given Ceco reason to return to the site, the undisputed evidence is that Ceco had not returned to the site to obtain the materials. The forms were still stacked nearby at the time of the fall. Moreover, the storage of these forms outside of the tank does not show reason for accessing the tank or that Ceco retained control over safety in the area.

■ Glenroy's representatives state that all July, 1989, punch list items which could be corrected at that time and for which Glenroy or Ceco was responsible had been corrected before they left on August 29 or 30, 1989. HHN had only to remove a plywood form covering a drain. This defect was not discovered until February, 1990; it was remedied in September, 1990, before the tanks were filled with water for the first time. It therefore did not give HHN personnel a reason to enter the tank before the accident.

Ramon also argues that there is sufficient circumstantial evidence to create a question of material fact as to whether, when the contractors left the area of the chill tank, they left the premises in an unsafe condition. Ramon points to the fact that the manhole had been opened by someone and covered only by a piece of plywood before he fell. He asserts the contractors were the last known to have occupied the area and to have used the manholes before Ramon had his accident. At least, in Grunau's words, when the evidence is considered in the light most favorable to Ramon,

"[t]here is no direct indication in the Record that anyone else used the manholes after Glenroy's and Ceco's use before the accident happened."

■■■ Our response is twofold. First, the record is replete with supposition about who might have been the last party to occupy the area in which Ramon fell. Indisputably, Ceco, Glenroy, and Huber worked in the area at one time, a good month before the accident. But, the record contains testimony from at least one of the witnesses that Grunau Mechanical had workers in the area; that the tank needed to be pumped periodically because of storm water; and, of course, that Grunau Fire Protection had access and reason to be in the area, as, after all, Ramon did. It is thus factually inaccurate to say the facts, when considered in the light most favorable to the non-movant show the movants to be the last to control the area. The undisputed facts least favorable to the contractors show Ramon's employer was the last to exercise jurisdiction over the area.

■■■ Second, the contractors have demonstrated that they were gone more than a month before Ramon's fall. Ramon cannot rely on his allegations but must come forward with *evidence* that the named defendants were the last to use the area. Instead, he asks us to deduce from the *absence of evidence in the record,* i.e. his own failure to produce evidence in contradiction or to eliminate others, that the contractors were the last to exercise control over the area. This is a step in logic no reasonable person would be willing to make. While admittedly circumstantial evidence may be sufficient to create a question of fact, when circumstantial evidence is offered, the question for the court becomes the reasonableness of the inference sought from the evidence. *See e.g. Haidri v. Egolf* (1982), Ind.App., 430 N.E.2d 429. Qualitatively, evidence fails when it cannot be said reasonably that the intended inference may logically be drawn therefrom. The failure of an inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture. *Wright Corp. v. Quack* (1988),

Ind.App., 526 N.E.2d 216, 217, *trans. denied.* That is the case here.

Lastly, Ramon argues that the matter comes down to a question of credibility which must be left for the jury. He suggests that the standard for review of a summary judgment has somehow changed and summary judgment must be denied if resolution thereof hinges upon a state of mind, credibility of witnesses, or weight of testimony. He cites *Funk v. Funk* (1990), Ind.App., 563 N.E.2d 127, 129, *trans. denied,* in which we stated that "[i]f there is a question of state of mind, credibility of witnesses, or weight of testimony, summary judgment should be denied." See *Mayhew v. Deister* (1969), 144 Ind.App. 111, 244 N.E.2d 448, 552, *trans. denied.*

■■■ The Indiana Supreme Court's most recent pronouncements on the T.R. 56(C) standard are dispositive of the question. The court must consider the pleadings and evidence sanctioned by 56(C) without deciding its weight or credibility. *Webb v. Jarvis,* 575 N.E.2d at 994. Rational assertions of fact and reasonable inferences therefrom are deemed to be true. *Id.; Burke v. Capello,* 520 N.E.2d 439. To be considered genuine under T.R. 56, a material issue must be established by sufficient evidence supporting the claimed factual dispute to require a jury or judge to resolve the parties' differing versions of the truth at trial. *Gaboury v. Ireland Road Grace Brethren, Inc.* (1983), Ind., 446 N.E.2d 1310, 1313. To permit the defeat of a summary judgment motion where the only issue of fact is the credibility of the affiant "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research & Development Co. v. Singer Co.* (2d Cir., 1969), 410 F.2d 572, 578 *quoted in id.* at 1315.

Alternatively, Ramon argues that each of the contractors owed him a contractual duty to use reasonable care for his benefit because each contract with the awarding unit contained the same provisions concerning safety. In addition, according to Ramon, Ceco accepted the responsibility for removing its materials from the job site

upon completion of the work. Apparently, it is Ramon's theory that by failing to remove its materials from the site, Ceco supplied the plywood piece which covered the manhole immediately before Ramon's accident.

And, Ramon assigns additional responsibility to HHN because "[a] reasonable inference from the facts would be that Huber had assumed 'general contractor' responsibility." Ramon distinguishes *Teitge*, 526 N.E.2d 1008, cited by the trial court, on the ground that HHN's contractual responsibilities were more expansive. Ramon points to the fact that HHN had accepted coordination responsibilities, conducted regular progress meetings, controlled the job site progress and held tool box meetings. Safety rule infractions had been brought to HHN's attention.

■ Each agreement begins by identifying "the Contractor" as the signatory and identifying the scope of the work. HHN's contract reads as follows:

Article 1. Scope of Work: The Contractor shall furnish all labor and materials and perform all of the Work shown on the Drawings and all of the Work described in the Specifications for the project titled: "General Construction ..."

Note: 1. The Work on Drawings and Specifications for General Construction is to be referred to hereinafter as "Contract 3A"

Note: 2. By execution of this Contract and in accordance to the specification § 01011, this Contractor, Contract 3A, accepts the assignments of Contracts 3B and 3C (Grunau Company, Inc.) ...

Each agreement then identifies the contract documents, among them a document entitled "General Conditions." The General Conditions define the "Contractor" as the person or organization identified as such in the agreement, section 4.1.1, and make the Contractor responsible "for the acts and omissions of all the subcontractors, their superintendents, their supervisory staffs, agents, or employees and of all other persons performing any of the Work under a contract with the Contractor. Section 4.9.1. Article 10 of the General Conditions deals with safety. It provides in relevant part:

10.1.1 The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.

10.2.1 The Contractor shall take all necessary precautions for the safety of, and will provide all necessary protection to prevent damage, injury, or loss to:

A. all employees on the Work and all other persons who may be affected thereby ...

10.2.2 The Contractor shall comply with all applicable laws, ordinances, rules, regulations and orders of any public authority having jurisdiction for the safety of persons ... or to protect them from damage, injury, or loss. He shall erect and maintain, as required by the conditions and progress of the Work, all necessary safeguards for safety and protection, including posing danger signs and other warnings against hazards, promulgating safety regulations, and notifying owners and users of adjacent utilities.

The contracts plainly impose a duty of reasonable care upon each contractor (excluding Ceco, of course) for the benefit of "all employees on the Work and all other persons who may be affected" by the Work. Glenroy's responsibilities with respect to the "Work" extended to acts and/or omissions of its subcontractor, Ceco. Glenroy therefore had an obligation to ensure that safety precautions were taken for the benefit of all other persons who may be affected by the work delegated to Ceco.

Ceco's last responsibility was to remove its forms for the access slabs through the manholes. At least some of the evidence establishes that the manhole through which Ramon fell was the manhole used to remove the forms for the access panel in the east chamber. But, as we have already indicated, the evidence is uncontradicted that Ceco employee Raul Garcia, by himself, capped the manhole with its 250 lb. steel cover, as his colleagues watched. And, Ceco and Glenroy foremen subsequently inspected each of the manholes and

found the covers to be in place. To the extent then that Ramon was a person affected "by the Work" to be performed by Ceco and Glenroy, the record reflects no factual dispute concerning the breach of such a duty.

Ramon points to Ceco's contractual obligation to remove its materials from the area. But, we are at loss to see how a violation of this obligation played a role in Ramon's injury. Ramon makes no claim that his fall was caused by the presence of the form materials. And, he has made no evidentiary showing that it was Ceco's form materials which were used to improperly cover the hole.

HHN likewise had a duty to persons who would be affected by "the Work". HHN was required by its contract to install the manholes and place the covers. This portion of its Work occurred on August 8, 1989. On the same day, HHN notified Grunau that the manholes and covers had been installed and that Grunau would be responsible for replacing the covers if its employees removed them. Warning to the superiors in employment of a person is warning to that person, the employment relationship permitting a reasonable assumption that such notice will be communicated in the ordinary course to all in on the work. *H.J.Ricks Construction Co.*, 509 N.E.2d at 205-6. Such is the case here where Grunau, by its contract with the awarding unit, accepted responsibility for the safety of its subcontractor's employees, particularly, those affected by the Work.

The record reflects that HHN also had responsibility following the concrete pouring of the access panels to come back and pour the finish slab. This work had nothing to do with the manholes or the covers and gave HHN no reason to enter the chill tank. Ramon has not presented any evidence that he was affected by HHN's work in pouring the access panels.

We acknowledge that the contractual provisions governing the class of persons to be benefited by the safety agreements between each contractor and the awarding unit here are broader than those at issue in *Teitge*, 526 N.E.2d at 1008, another multi-prime contractor case. The provisions in *Harris v. Kettlehut Construction Inc.*, 468 N.E.2d 1069, are more akin. But the contract in *Harris* required the Contractor to take necessary precautions for the safety of all employees on the Project, a term which necessarily varies in its meaning from "the Work" used here because Kettlehut was responsible for the entire project. As the court states, Kettlehut's contract gave Kettlehut as prime contractor the non-delegable duty to provide project-wide safety to all employees. Nowhere in the contracts we examine today is there expressed any intent to make any contractor responsible for project-wide safety.

Thus, while there is expansive language in *Harris* that Kettlehut's duty extended *to all employees on the site*, the decision's reach can be no greater than the circumstances involved in it. Harris was an employee under a subcontract with Kettlehut. The work, project, or subject matter of Kettlehut's and subcontractor Baker's contracts was necessarily the same. There was only one "prime" contractor in that case as in the cases relied upon by the *Kettlehut* court in reaching its decision. This distinction makes the reasoning of *Teitge* more palatable under the present circumstances. Without an explicit statement that all employees or persons on the project were to be protected by each contractor, it is more logical to conclude that each contractor was responsible for providing protection during the performance of its portion of the contract, not at all times.

Ramon argues that HHN assumed additional responsibilities because it accepted the assignment of other contracts, including Grunau's, another prime contractor. But, the provisions of HHN's contract governing assignment unambiguously require HHN to accept assignment of the other contracts for purposes of coordination only. Project Coordination Specification § 01041 sets out in detail HHN's responsibilities in this respect. Nowhere in this document is any mention made of safety. Several recent cases recite the rule that the assump-

tion of supervision or coordination duties does not equate with the assumption of project safety. *See e.g. East Chicago Sanitary District*, 590 N.E.2d at 1074; *Alexander v. City of Shelbyville* (1991), Ind. App., 575 N.E.2d 1058, 1060, *trans. denied; Teitge*, 526 N.E.2d 1008.

Grunau argues that HHN, by its affirmative conduct, assumed a duty to use reasonable care for the safety of Ramon. We have reviewed the argument made by Ramon below and the issues of material fact designated by him. If there are questions of fact precluding summary judgment on this assumption of duty theory, they were not pointed out to the trial court. For that reason, they do not provide a ground for reversal now. T.R. 56(H); *Mithoefer*, 563 N.E.2d at 553.

In sum, we conclude the trial court properly found no statutory duty on the part of Glenroy, Ceco or HHN to conform their conduct for the benefit of Ramon. Although each of these defendants may have had a contractual duty, the uncontradicted evidence shows that either the duties were not breached or, with respect to Ceco, were not a cause of Ramon's injuries. There is also no evidence HHN assumed a contractual duty by agreeing to coordinate the work involved in certain other contracts. For these reasons, we agree the judgments in favor of Glenroy, Ceco and HHN should be affirmed.

Judgment affirmed.

BAKER and BARTEAU, JJ., concur.