Stephen DAWSON, Alice Francis, and Francis Real Estate of Lafayette, Inc., Appellants (Defendants Below),

v.

Marvin E. HUMMER and Katherine M. Hummer, Appellees (Plaintiffs Below).

No. 79A04–9412–CV–518.

Court of Appeals of Indiana, Fourth District.

April 18, 1995.

---

John B. Drummy, Eric D. Johnson, William L. O'Connor, Kightlinger & Gray, Indianapolis, for appellants.

James R. Schrier, Angela M. Service, Reiling, Teder, Withered & Rush, Lafayette, for appellees.

**OPINION**

DARDEN, Judge.

*STATEMENT OF THE CASE*

Stephen Dawson, Alice Francis, and Alice Francis Real Estate of Lafayette, Inc. (Realtors) appeal from the $18,000.00 verdict in favor of Marvin and Katherine Hummer.

We affirm.

*ISSUES*

I.  Whether the trial court erred in denying Realtors' motion for summary judgment.

II.  Whether the verdict is supported by sufficient evidence.

III.  Whether the trial court erred in refusing Realtors' tendered jury instruction.

IV.  Whether the trial court erred in denying Realtors' motion for new trial alleging prejudice because, unbeknownst to the trial court and the parties, the jury obtained a legal dictionary and looked up the definitions of several terms.

*FACTS*

The summary judgment facts, which are revealed in Marvin and Katherine's deposi-

tions, are undisputed. Thirty-two year-old Marvin is a high school graduate who spent four years in the military where he received training to be a mechanic. He has been employed as a delivery truck driver for a venetian blind company for the last seven years. Thirty year-old Katherine is also a high school graduate. In addition, she is a licensed cosmetologist, and she has a medical assistant diploma from Ivy Tech. She currently runs an orthopedic surgeon's office where her duties include dealing with patients, office paperwork, and ordering supplies. Prior to the instant dispute, Marvin had not purchased a house, although Katherine had purchased a house through FHA during her first marriage.

In the spring of 1990, Marvin and Katherine decided to purchase a house. They contacted Stephen Dawson, a real estate agent and employee of Francis Real Estate, to assist them in their search. The Hummers told Dawson they were looking for a four-bedroom home with a usable basement in the $45,000.00 to $50,000.00 range. They also told Dawson they wanted to use "Marvin's VA privilege" in obtaining a mortgage. R. at 215. Dawson did not explain the VA loan procedure to them at that time. During the ensuing months, it was primarily Katherine who saw to the details of purchasing a house.

Eventually, Dawson showed the Hummers a house on South 24th Street upon which they made an offer. Although they filled out a purchase agreement, they did not order any inspections of the property. When the offer was accepted, Dawson told the Hummers the VA "would come through the house and look for things." R. at 220. Upon Dawson's advice, the Hummers then went to Prime Mortgage to obtain a loan where they filled out the necessary VA paperwork. Later, Dawson informed them that the garage windowsills had to be scraped and painted before closing on the house could take place. Katherine believed that it was the VA that informed Steve Dawson about the windowsills because he told the Hummers that the VA approved the loan for the house. The owner of the South 24th Street house purchased the paint, while the Hummers did the

scraping and painting. Although it is not clear, Dawson apparently assisted Marvin with the windowsills one evening.

The day before closing, a pest inspection was done on the house. Although the Hummers did not order the inspection, Katherine "understood that's automatically done when you purchase a house." R. at 225–6. Dawson informed the Hummers the pest inspection inadvertently revealed water damage to the joists which would cost between $3,000.00 and $4,000.00 to repair. Because the owner refused to pay for the repair, which the Hummers could not afford, the deal fell through.

Several days later, sometime during the end of September of 1990, Dawson informed the Hummers a house fitting their needs was available on South 4th Street. Dawson met the Hummers and the group toured the house for a half hour to an hour. When they arrived in the basement, Katherine noticed that all the walls were bowed. Upon one wall were affixed metal plates from which metal rods protruded. The basement was divided into a laundry room, a workshop, and a bedroom. The floor of the bedroom was made of plywood and was built up several inches off the concrete basement floor. Although it was raining that day, Katherine did not remember if there was any water in the basement. Marvin recalled:

> The walls. They're not straight like these are. They come out and bow out and bow back in, and I never seen that in a brick wall without what I would think collapse of it. But I asked him about it, and they had put some kind of anchor system on it, and that was the worst one, and it was fixed.

R. at 146. The Hummers questioned Dawson about the bowed basement walls and the wall anchor system. Dawson told the Hummers that the anchored wall had been fixed and that the other walls were fine. Nevertheless, Marvin admitted "you could look at them and tell they were bowed as bad as the one was." R. at 147. Katherine asked Dawson "if the basement was usable as far as our oldest son sleeping down there," and Dawson "said yes." R. at 238. While the group was still in the basement, Dawson also told them "the VA would do inspections of the house."

R. at 247. When asked about the conversation regarding inspections of the house, Marvin stated:

I know we talked about inspections because of the way the thing—the first deal did because somebody inspected it to find that the garage and windowsills needed to be scraped and painted.

This is on the 24th Street address, okay? And somebody inspected that, then they inspected it again to find the floor joist damage.

So when we looked at the other place I asked him, man, are these okay, and trusting his word because they found at this other place that these minor things, faults, were wrong I took his word for it when he said yes, these are okay. That was what— I believed him.

He also told us that the VA did inspections. VA would inspect this place and if it was bad that it would be found. And the way the deal on 24th Street went, that's what we assumed would happen here.

R. at 148–9. When questioned, however, Marvin admitted he had no idea who performed the inspections at the 24th Street address.

The Hummers went home and later called Dawson to inform him they would make an offer on the house. He advised them to offer the list price, and they agreed. A few days later, the Hummers met Dawson at the Francis real estate offices and he told the Hummers he would draw the paperwork "up same as he did on the South 24th Street house." R. at 243. Furthermore, "[Dawson] told us that for the house to be inspected outside of the VA that we would have to pay them, meaning Alice Francis I guess, $175 extra, and then they would find an inspector for us also." R. at 243. The Hummers could not afford an inspection, however, and they therefore signed a waiver of an "additional inspection." R. at 244. Specifically, the purchase agreement contained the following pertinent clauses:

Purchaser has personally inspected the real estate and improvements, if any, and unless other inspections have been ordered or accepted in this purchase agreement, makes this offering in good faith based

entirely upon the results of his own examination.

The Purchaser hereby acknowledges that, unless otherwise agreed, the selling broker, including a listing broker showing his/her own listing, is exclusively the agent of the seller, and not the agent of the purchaser. However, the Selling Broker is under a duty to treat all parties in a transaction fairly.

Purchaser has been made aware that independent inspections disclosing condition of the property are available and has been afforded the opportunity to require as a condition of the Agreement the above-mentioned inspections. However, Purchaser hereby waives inspections and relies upon the conditions of the property based upon his own examination and releases the Seller, Broker, and Salespersons from any and all liability relating to any defect or deficiency affecting the property, which waivers shall survive the closing.

R. at 28–9. Dawson told the Hummers that "if [the house] wasn't [structurally sound] the VA would find it." R. at 244.

The owners of the South 4th Street house accepted the Hummers' offer. The Hummers went back to Prime Mortgage to complete a new VA application, and Alice Francis set up the closing date. Because the Hummers were unable to come up with another loan application fee, Francis Realty loaned the Hummers $225.00. Katherine knew the "VA has something to do with" an appraisal of the property, and thought that "there is a paper that comes from the VA. That's how we found out about having to scrape and paint the windows in the other house." R. at 250. Katherine admitted that a paper came from the VA concerning the South 4th Street house which stated "they saw the fixtures in the basement wall, but [she] didn't think there was anything else that [they] had to do with the house." R. at 250.

Sometime before the closing date, Angie Newton, a friend of Katherine's, heard the Hummers were going to purchase the South 4th Street house. Angie, who is a real estate agent, told Katherine that she had taken a client through the South 4th Street property.

The client's father, who is an FHA inspector, advised the client not to purchase the house under any circumstances because of the bowed basement walls. Angie told Katherine she had not yet informed Alice Francis about the FHA inspector's opinion. Thereafter, Katherine phoned Alice Francis to discuss the basement information given to her by Angie. Alice Francis told Katherine that one basement wall had been repaired and the remaining walls were fine. Katherine spoke with Angie later in passing and told her Alice Francis maintained the basement walls were fine. Angie, however, maintained otherwise. The Hummers were supplied with an instructional manual on the "Grip–Tite Wall Anchor System" which was installed in one of the walls. However, the Hummers do not know who provided them with the manual. On October 29, 1990, the Hummers closed on the house, and took immediate possession.

When asked when she first suspected a problem with the basement walls, Katherine responded:

> I had always felt that there was probably something wrong with the basement. I believe sometime after we had moved in Marvin and I discussed getting another inspector to come in to alleviate my bad feelings on the house.

R. at 258. Marvin suspected problems when the basement leaked after a heavy rainfall. To that end, the Hummers called a contractor who, after inspecting the basement walls, informed them it would cost $22,250.00 to correct the problems. The contractor recommended condemnation. Thereafter, two city building inspectors informed the Hummers that although the basement walls were bad, the house did not need to be condemned at that time. Kellie Snethen, the prior owner of the 4th Street house, contacted the Hummers and assured them the basement walls had been fixed and were okay. Katherine remarked that since the Hummers moved in, cracks in the basement walls enlarged.

The Hummers then filed suit against Dawson, Alice Francis, and Francis Realty alleging fraudulent misrepresentation and constructive fraud. The Realtors responded with a motion for summary judgment alleging the Hummers had no right to rely on the representations concerning the basement walls, that by signing the "Inspection Addendum," the Hummers released any claims against the Realtors, and that because the Realtors had no fiduciary relationship with the Hummers, they owed no duty to them. The trial court denied the motion, and the case proceeded to trial where a jury returned a verdict for the Hummers and awarded them $18,000.00. Additional facts will be presented in our discussion of the issues.

## DECISION

## I. SUMMARY JUDGMENT

Essentially, the Hummers predicate their claims for fraud and constructive fraud upon two representations of fact made by Realtors: 1) that one basement wall was repaired while the other walls were fine when, in fact, all four walls were unstable, and 2) that the VA "inspection" would reveal any structural problems with the house when, in fact, it did not. R. at 118, 267–8; Appellee's Brief at 7. Realtors claim the trial court erred in denying their motion for summary judgment. When reviewing the grant or denial of summary judgment, we use the same standard used by the trial court. *Ramon v. Glenroy Construction Co., Inc.* (1993), Ind.App., 609 N.E.2d 1123, 1127, *trans. denied.* Summary judgment is appropriate only when the evidentiary matter designated by the parties shows that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* Where undisputed facts lead to conflicting inferences, summary judgment is inappropriate. *Greathouse v. Armstrong* (1993), Ind., 616 N.E.2d 364, 366.

In support of their contention that the trial court erred in denying their summary judgment motion, Realtors point out that in order to prevail on a theory of fraud, the Hummers must prove the existence of the following elements: 1) a material representation of past or existing facts which 2) was false, 3) was made with knowledge or in reckless ignorance of the falsity, 4) was relied upon by the complaining party; and 5) proximately cause the complaining party injury. *Showalter, Inc. v. Smith* (1994), Ind.

App., 629 N.E.2d 272, 274, *trans. denied.* The element of reliance consists of two distinct parts: the fact of reliance and the right of reliance. *Plymale v. Upright* (1981), Ind. App., 419 N.E.2d 756, 761. Realtors claim the Hummers had no right to rely on the above-mentioned representations because, given the undisputed facts, such reliance is not reasonable.

■ Specifically, Realtors argue, the Hummers' reliance was unjustified because it is undisputed that the Hummers had actual notice the basement walls were bowed. Furthermore, the Hummers knew an FHA inspector had advised his daughter against buying the house because of the bowed walls, and the Hummers knew that at the time Katherine spoke with Alice Francis about this information, Alice was not yet aware the FHA inspector had looked at the house. Also, the Hummers should have known the extensive floor joist damage of the 24th Street house was discovered by a pest inspector the day before closing, rather than by a VA inspector. Thus, Realtors conclude, the undisputed evidence reveals the Hummers acted unreasonably in relying on the Realtors' representations and failing to secure an independent inspection of the basement walls.

The Hummers concede the facts are undisputed, R. at 15, but argue they are susceptible to more than one reasonable inference with respect to whether the Hummers' reliance was reasonable, and, therefore, summary judgment was inappropriate. We agree. For example, the Hummers point to their lack of experience in real estate transactions which contrasts sharply with Realtors' knowledge and experience. The Hummers initiated a relationship with Realtors which continued for six months as Realtors assisted the Hummers in finding a house that fit their needs. The Hummers relied on the advice of Realtors in choosing a mortgage company, in filling out the purchase agreements, and in offering the list price for the 4th Street house. The paperwork for the purchase of the 4th Street house was the same as for that of the 24th Street house where Realtors had informed them of the joist problem and assisted them in withdrawing from the deal. More importantly, however, we note that Dawson assisted the Hummers in scraping and painting the window-sills on the 24th Street property, and that Realtors also loaned them the money for the second loan application.

Thus, while the undisputed facts reveal the Hummers failed to use their best judgment in purchasing the 4th Street house, we find that the facts with respect to their right to rely also give rise to the inference that their reliance may have been justified—given the disparity in experience, the on-going relationship, and the various types of assistance provided by Realtors—thus creating a question of fact for the jury.

■ Realtors also point to the following exculpatory clause within the purchase agreement in an effort to demonstrate the trial court erred in denying their motion for summary judgment:

> However, Purchaser hereby waives inspections and relies upon the condition of the property based upon his own examination and releases the Seller, Broker, and Salespersons from any and all liability relating to any defect or deficiency affecting the property, which waivers shall survive the closing.

R. at 29.

■ While Indiana does recognize exculpatory clauses, *General Bargain Center v. American Alarm Co.* (1982), Ind.App., 430 N.E.2d 407, 411, they are only enforceable "so long as they are knowingly and willingly made and free from fraud." *Id.* Because the facts are in dispute as to whether Realtors committed fraud, we cannot say as a matter of law that this exculpatory clause renders Realtors immune from liability.

Therefore, the trial court did not err in denying Realtors' motion for summary judgment with respect to whether the Hummers had a right to rely on Realtors' representations.[1]

---

1. Reliance is also an element of constructive fraud. *See* discussion, *infra.* In *Biberstine v. New York Blower Co.* (1993), Ind.App., 625 N.E.2d 1308, *reh'g denied,* this court treated the reliance element of constructive fraud in the same manner as that element is treated in a

Next, Realtors argue the trial court erred in denying their motion for summary judgment as to the Hummers' complaint for constructive fraud. Constructive fraud arises by operation of law when there is a course of conduct which, if sanctioned by law, would secure an unconscionable advantage, irrespective of the actual intent to defraud. *Biberstine v. New York Blower Co.* (1993), Ind.App., 625 N.E.2d 1308, 1315, *reh'g denied.* The elements of constructive fraud are: 1) a duty existing by virtue of the relationship between the parties, 2) representations or omissions made in violation of that duty, 3) reliance thereon by the complaining party, 4) injury to the complaining party as a proximate result thereof, and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party. *Id.*

Realtors claim the Hummers may not maintain an action for constructive fraud because the purchase agreement specifically states Realtors are "exclusively the agent of the seller, and not the agent of the purchaser," R. at 201, and, therefore, no fiduciary relationship exists between Realtors and the Hummers. Thus, Realtors posit, they did not owe the Hummers a duty of care.

On the other hand, constructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. *Id.* Accordingly, the Hummers argue that the facts indicate a confidential relationship did exist between themselves and Realtors.

We note that the question of whether a confidential relationship exists is one of fact to be determined by the finder of fact, *id.;* and once again conclude the undisputed facts give rise to conflicting inferences. Thus, while the purchase agreement clearly states that Realtors are the exclusive agents of the Sellers, as noted above the undisputed facts also reveal the Hummers were inexperienced home buyers who contacted Realtors for as-

sistance in purchasing a home, that they relied on Realtors' advice, and that Realtors assisted the Hummers in the resolution of their home-buying problems.

Accordingly, we cannot say the trial court erred in denying Realtors' motion for summary judgment as to the Hummers' complaint for constructive fraud and setting the case for trial.

## II. SUFFICIENCY OF THE EVIDENCE

Realtors argue the evidence on several of the elements of the Hummers' complaint for fraud and constructive fraud is insufficient to support the jury's verdict in favor of the Hummers.

When reviewing a claim of insufficient evidence, this Court neither weighs the evidence nor judges the credibility of witnesses. Rather, the Court may view only the evidence and reasonable inferences therefrom which support the verdict. If substantial evidence of probative value establishes each material element of the claim, this Court will affirm the judgment. *Bob Schwartz Ford, Inc. v. Dunham* (1994), Ind. App., 631 N.E.2d 953, 955.

### A.

As noted previously, in order to succeed on their complaint for fraud, the Hummers must show that the representations Realtors made concerning the condition of the basement walls and the VA inspection were not only false, but also that these representations were made with knowledge or in reckless ignorance of the falsity of the representation. *Showalter, supra.* At trial, the Hummers conceded that Realtors did not knowingly make the false representations. Instead, Hummers appeared to argue that Realtors recklessly made the false representations. R. at 478.

---

claim for fraud. We stated "[t]he element of reliance is established only where the complaining party demonstrates he had a right to rely upon defendant's representations." *Id.* at 1316. Accordingly, Realtors also contend the trial court erred in denying their motion for summary judgment on the Hummers' constructive fraud claim arguing the Hummers had no right to rely on

their representations. However, as noted, the undisputed facts give rise to differing inferences as to whether the Hummers, in fact, had a right to rely. Therefore, the trial court did not err in denying Realtor's motion for summary judgment as to the reliance element of the Hummer's constructive fraud claim.

Realtors argue the evidence is insufficient to show they made the representations recklessly. The evidence as to the origin of Realtors' knowledge concerning the condition of the bowed basement walls is found in the trial testimony of Kellie Snethen, the previous owner of the 4th Street house and an Alice Francis employee, and Alice Francis. Kellie called a contractor from Indianapolis to look at one of the basement walls. While the contractor looked at the wall, Kellie was upstairs. Later, the contractor told her the wall could be repaired with a Grip–Tite system, which he installed. Kellie did not know if the contractor examined the remaining walls, and assumed, because he did not mention them, the rest of the walls were fine. When she listed the house, Kellie told Alice Francis about the wall repair, provided her with a copy of the Grip–Tite instructions, and told Alice about her beliefs concerning the condition of the walls.

We note there is no evidence that Kellie provided Alice with an inspection report of the basement walls, or that Kellie had any expertise in evaluating the structural soundness of basement walls. Neither is there evidence that Alice asked Kellie any questions concerning the basis and details of her belief that one wall was fixed and the remaining three were fine. Alice then informed all of her associates about the "treatment that was being done to the wall." R. at 718. There is no evidence Alice told the associates anything about the remaining walls, and there is no evidence Steve Dawson sought any further information from either Kellie or Alice about the condition of the basement walls. Nevertheless, there is evidence which indicates both Alice and Steve told the Hummers that one of the basement walls had been fixed and that the rest were fine. It would appear that Realtors based their representations of fact concerning the condition of the remaining three basement walls upon their own uninformed assumptions. Thus, while the evidence fails to support the inference that Realtors knowingly made false representations about the basement walls, we find the evidence supports an inference that Realtors made the representations with reckless ignorance of their falsity.

Realtors next argue that the evidence does not support the inference that Dawson recklessly made representations concerning the role of the VA. A VA appraisal is a market valuation of the property for purposes of a VA loan guarantee, while an inspection is a technical evaluation of the condition of the property. The evidence reveals that Dawson understands the difference between a VA appraisal and an inspection. R. at 728 and 729. It is evident, however, that the Hummers did not understand the distinction. Furthermore, the evidence indicates Dawson knew that the VA appraisal on the 24th Street House revealed only that the garage windowsills needed to be painted, and that it was, in fact, the unrelated pest inspection which revealed the floor joist damage. Nevertheless, there is evidence indicating Dawson told the Hummers the VA would send someone out to look at the house, as it did before, and that if anything was wrong, the VA inspector would find it. The evidence supports an inference that Dawson's comments with respect to the VA were, at the very least, recklessly made.

### B.

Realtors again claim there is no evidence to support the conclusion that the Hummers' reliance upon Realtors' representations was reasonable. Accordingly, they argue, the Hummers' claims for both fraud and constructive fraud must fail. In support of their contention, Realtors point to substantially the same facts as those they relied upon in their motion for summary judgment wherein they raised the same issue. *See discussion, infra.*

After a review of the trial record, we again point to the same facts which led to our conclusion that the undisputed facts give rise to conflicting inferences with respect to whether the Hummers' reliance on Realtors' representations was reasonable which created a question of fact for the jury. In general, we noted the disparity in the parties' home-buying experience, the nature of the on-going relationship between the parties, and the various types of assistance and advice Realtors provided the Hummers. Apparently the jury found these facts persua-

sive as to the reliance element of both the Hummers' fraud and constructive fraud theories. The evidence is sufficient to support the inference that the Hummers' reliance was reasonable, and, therefore, we must decline Realtors' invitation to reweigh the evidence.

### C.

■ Finally, to succeed in an action for constructive fraud, the Hummers must show that Realtors owed the Hummers a duty by virtue of the relationship between them. *Biberstine, supra.* Realtors again argue the Hummers may not maintain an action for constructive fraud against them since they owed the Hummers no duty of care because the purchase agreement states Realtors are "exclusively the agent of the seller, and not the agent of the purchaser." R. at 201. *See discussion, supra.*

■ As noted, constructive fraud may be found where one party takes unconscionable advantage of his dominant position in a confidential or fiduciary relationship. *Id.* Furthermore, whether a confidential relationship exists is one of fact to be determined by the finder of fact. *Id.* Our review of the trial record reveals the facts before the jury at trial were the same facts upon which we relied in concluding the trial court did not err in denying Realtors' motion for summary judgment as to this issue. Thus, we cannot say the evidence is insufficient to support the inference a confidential relationship arose between the parties giving rise to a duty on the part of Realtors.

### III. JURY INSTRUCTION

■ Following the presentation of evidence, Realtors proposed the following jury instruction to which the Hummers objected:

One who signs a contract is bound by law to have read and understood the contract.

R. at 769. The trial court sustained the Hummers' objection. Realtors argue the trial court erred in failing to give their tendered instruction, and, therefore, request a new trial.

■■ In reviewing a trial court's refusal to give tendered instructions, a three part inquiry is used: (1) whether the tendered instruction is a correct statement of the law, (2) whether there is evidence in the record to support the instruction, and (3) whether the substance of the instruction is covered by other instructions given by the court. *Compton v. Pletch* (1990), Ind.App., 561 N.E.2d 803, 805. However, reversal will not result unless the failure to give the instruction substantially and adversely affected the rights of the complaining party so as to quite likely have affected the result. *Id.*

Our research reveals some support for Realtors' contention the tendered instruction is a correct statement of the law. *See W.T. Rawleigh Co. v. Snider* (1935), 207 Ind. 686, 690, 194 N.E. 356 ("one who signs such a contract is bound to know the extent of his liability thereunder . . ."); *Robertson's Music House v. Holy* (1925), 82 Ind.App. 529, 532, 146 N.E. 862 ("[t]he appellee herein was a party to the written contract and is thereby charged with knowing the contents of the same"). Furthermore, the instruction is supported by the Katherine Hummer's testimony wherein she admitted reading the purchase agreement—albeit briefly, and by Marvin's testimony wherein he admitted to having reviewed the purchase agreement with Steve Dawson. R. at 591 and 687. Finally, our review of the jury instructions reveals that the substance of the Realtors' tendered instruction was not covered by any other instruction or combination of instructions.

Our next inquiry, then, is whether Realtors have been prejudiced by the trial court's refusal to give their tendered instruction. Realtors claim their "substantial rights were prejudiced" because "[o]ne of the Realtors' arguments was that Plaintiffs could not maintain their cause of action due to the contract they signed. The Realtors' proposed instruction number five would have informed the jury that Plaintiffs were bound by the terms of the contract they signed . . .". Brief of Appellant at 45.

We disagree with Realtors' characterization of the information their tendered instruction would have imparted to the jury. Realtors' tendered instruction mentioned nothing about the Hummers being bound by the terms of the contract they had read and

signed. Rather, it would have instructed the jury that the Hummers were bound by law to have "read and understood the contract" they signed. That the Hummers read and understood the purchase agreement is not an issue in this case, however. They admitted to having read and reviewed the purchase agreement. Moreover, the record demonstrates the Hummers understood the nature of the exculpatory clauses contained within the purchase agreement and inspection addendum; however, because of Realtors' representations concerning the condition of the basement walls and the VA inspections, they testified, the Hummers were no longer willing to abide by those clauses.

Thus, we find Realtors have failed to demonstrate prejudice, and, accordingly, find the trial court did not err in refusing to give Realtors tendered instruction.

## IV. LEGAL DICTIONARY

■ Unbeknownst to the trial court or to either party's counsel, the bailiff supplied a legal dictionary to the jury during its deliberations. Realtors filed a motion to correct errors in which they requested a new trial.[2] Realtors also filed the affidavits of two jurors. The trial court found Realtors failed to demonstrate prejudice, and therefore denied their motion. Realtors contend the jury's misconduct constitutes reversible error. The grant or denial of a motion for new trial is within the broad discretion of the trial court, and we will reverse only for abuse of discretion. *Schuh v. Silcox* (1991), Ind. App., 581 N.E.2d 926, 927. Furthermore, Indiana adheres to the common law rule that a verdict may not be impeached by evidence from the jurors who returned it. *Bockting v. State* (1992), Ind.App., 591 N.E.2d 576, 579, *trans. denied.* A notable exception occurs when evidence shows that the jury was exposed to improper, extrinsic material during its deliberations, and when a substantial possibility exists that the verdict was prejudiced by the improper material. *Id.*

In *Shultz v. State* (1981), Ind.App., 417 N.E.2d 1127, *reh'g denied,* this court conclud-

ed that, absent a showing of prejudice, the trial court did not commit reversible error when it provided the jury with a dictionary at the jury's request. We noted that the majority of jurisdictions facing this issue have held that "prejudice to the complaining party is not presumed but must affirmatively appear to require or justify a reversal or new trial." *Id.*" at 1133 (quoting 54 A.L.R.2d at 738–9). *See also Bockting, supra.*

■ Thus, the burden is upon Realtors to demonstrate the existence of such prejudice as would require reversal. Here, the affidavit of Juror King states in pertinent part:

5. During deliberations, we asked the Bailiff for a legal dictionary and he gave us a legal dictionary.

6. We looked up some words in the dictionary which we found in the instructions.

R. at 444.

The affidavit of Juror Beutler states in pertinent part:

5. After closing arguments and during deliberations, we asked to get a legal dictionary from the Bailiff.

6. The Bailiff gave us a legal dictionary and we used that legal dictionary to look up some terms in the instructions.

7. Specifically, I remember that we looked up the word artifice and attempted to find out a simpler explanation or difference between fraud and constructive fraud by using the legal dictionary.

8. This dictionary was mostly handled by the foreman of the jury, but all of the jurors listened to the definitions given.

R. at 439.

Juror Beutler's affidavit also includes the following statement which has been crossed out and initialed by her:

9. We did use the definitions and help from the legal dictionary during our deliberations to reach our verdict.

R. at 439.

Parroting the trial court's order denying Realtors' motion to correct errors, the Hum-

---

2. Ind.Trial Rule 59(A) provides "A Motion to Correct Error is not a prerequisite for appeal, except when a party seeks to address: Newly discovered material evidence, including alleged jury misconduct...."

mers contend the jury's actions do not constitute reversible error because Realtors failed to demonstrate prejudice. In support of their contention, the Hummers point to the fact that Juror Beutler crossed out paragraph number nine of her affidavit. Thus, they argue, Realtors have failed to demonstrate the jury's use of the legal dictionary prejudiced the verdict.

■■■■ We note that it is the duty of the court to define to the jury the meaning of legal terms and the applicable law governing the case. *Anderson v. Taylor* (1972), 154 Ind.App. 217, 289 N.E.2d 781, 785. Further, the purpose of instructions is to guide the jury in the application of correct principles of law to the facts of the case before them. *Peak v. Campbell* (1991), Ind., 578 N.E.2d 360, 361. In this case, however, despite the fact that the trial court instructed the jury "you must determine the facts from a consideration of all the evidence in light of the law as contained in these instructions," R. at 810, there is little doubt the jury clearly sought to independently define the meaning of at least three legal terms, as evidenced by the fact that the jury specifically requested the bailiff to furnish it with a *legal* dictionary for the purpose of finding a "simpler explanation" of the difference between fraud and constructive fraud.

However, we cannot say the fact that the jury read the various definitions from a legal dictionary is, in itself, enough to demonstrate prejudice because, to begin with, we do not even know which legal dictionary the jury obtained. We are therefore unable to determine if the definitions it read conflicted with the trial court's instructions. Furthermore, there is no evidence the jury actually utilized the information in its deliberations. Thus, absent contrary information indicating prejudice from either the remaining four jurors or the bailiff, we cannot say the trial court abused its discretion in denying Realtor's motion to correct errors. An opposite result would impermissibly substitute our speculatory opinion for the trial court's judgment.[3]

That is not to say, however, that we condone the practice of supplying jurors with legal dictionaries. To the contrary, we advise our trial courts to admonish their bailiffs to refrain from providing any information to a jury without the prior approval of both the trial court and the parties' counsel.

Affirmed.

CHEZEM and BARTEAU, JJ., concur.

■■■■■■■■■■■■■■■■■■■■■■

---

3. Citing *Shultz, supra,* Realtors note that the reasoning behind this court's adoption of the majority rule requiring the party complaining of jury misconduct to affirmatively demonstrate prejudice is that the terms within regular dictionaries are generally believed to be within the common knowledge of a jury.

Realtors appear to argue that Indiana should adopt the opposite approach with respect to legal dictionaries since legal terms of art are not typically within the common knowledge of a jury. In other words, Indiana should presume prejudice whenever a party demonstrates the jury had access to a legal dictionary, and, furthermore, the burden should be upon the opposing party to demonstrate that no prejudice occurred.

We are unpersuaded. Initially, we note Realtors have failed to cite any authority for contravening traditional notions of placing the burden to show prejudice upon the complaining party. Moreover, in our opinion, such a rule would invite fishing expeditions into the jury's deliberation process and endanger the finality of the jury's verdict.